# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ERIC ENDECOTT,

                    Plaintiff,

v.                                                    Case No.  16-2190-JWB

COMMERCIAL FLOORWORKS, INC. and
JAMES PEDERSON,

                    Defendants.

## MEMORANDUM AND ORDER

This case comes before the court on Plaintiff Eric Endecott's motion for partial summary judgment (Doc. 72) and Defendants Commercial Floorworks, Inc. ("CF") and James Pederson's motion for summary judgment (Doc. 74).  The motions have been fully briefed and are ripe for decision.  (Docs. 73, 77, Exh. A[1], 78, 80, 82, 83.)  Plaintiff's motion is GRANTED IN PART AND DENIED IN PART and Defendants' motion is GRANTED IN PART AND DENIED IN PART for the reasons herein.

### I.      Facts[2]

Plaintiff was employed by CF beginning in January 2006.  CF is engaged in the sale of floor coverings and CF's customers are primarily contractors.  (Doc. 73 at 3.)  Defendant Pederson is the owner and President of CF.  Plaintiff worked in CF's Lawrence office as a sales

---

[1] Defendants' initial memorandum in support of summary judgment filed at Doc. 75 exceeded this court's standing order on page limitations.  (Doc. 75.)  Plaintiff moved to strike the memorandum.  (Doc. 76.)  Defendants did not oppose the motion to strike and revised their memorandum.  (Doc. 77, Exh. A.)  Plaintiff's motion to strike is granted. (Doc. 76.)  Defendants are directed to file their revised memorandum.  Because the parties' subsequent briefing on Defendants' motion for summary judgment responded to the revised memorandum, there is no need for the parties to refile their response briefs and the court may proceed to rule on the dispositive motions.
[2] The facts stated herein are uncontroverted unless specifically identified as controverted.

manager.  Plaintiff was the only employee responsible for sales in the Lawrence office and, at times, the Lawrence office would include a support person who worked for Plaintiff. Plaintiff's job duties included "looking for new business, estimating jobs, providing proposals for jobs, customer relations, selling, negotiating material costs, working with installers, and managing the jobs that he sold, including billing and collections."  (Doc. 77, Exh. A at 3.)  Plaintiff also ordered materials, tracked orders, coordinated shipments and deliveries, staged materials, did flooring layouts and managed contracts.  (Doc. 73 at 3-4.)  The parties dispute the amount of time Plaintiff spent in the Lawrence office performing his work and also dispute whether Plaintiff conducted sales while in the office or at another location.  (*See* Docs. 73 at 4-5; 78 at 2-3; 80 at 9; 82 at 2.)

Plaintiff's compensation structure was not in writing but he was paid by commissions which were accrued in Plaintiff's commission account.  Plaintiff received weekly draws and other occasional draws from his account until July 2015.  Plaintiff did not receive any overtime compensation and his hours worked were not recorded.  (Doc. 73 at 5-6.)  CF calculated Plaintiff's commissions by using the following formula: "Commission = (Gross Profit [Sales Income - Costs of Goods Sold] times Commission percentage) less Division Expenses plus Prior year carryover less Account Receivable Adjustment."  (Doc. 77, Exh. A at 3.)  Division expenses include an expense called the "payroll tax expense," which is a deduction for CF's share of "Social Security, Medicare and Kansas and Federal unemployment tax paid for that Sales Manager."  (Doc. 77, Exh. A at 9.)  Pederson directed the deductions for the payroll taxes. (Docs. 73 at 8; 78 at 5.)  Plaintiff was aware of the payroll tax deduction from his commission.

Brenda Foster was the office manager and controller of CF.  Foster does all the bookkeeping for CF, including payroll and calculating sales commissions.  (Doc. 73 at 2.)  Foster

testified that she considered Plaintiff exempt from overtime because he was a "salesman and he was a highly compensated employee." (Foster Dep. 42:23-24, Doc. 75, Exh. 3.)

In 2008, Plaintiff's commission percentage was 32%. The commission percentage was later reduced to 30% in 2009 or 2010. Pederson and Plaintiff had a conversation regarding the change in commission rate. Plaintiff contends that his rate was to remain at 32%. Defendants dispute this fact. Effective April 13, 2010, Plaintiff received a draw of $2,000 per week. Defendants contend that the $2,000 amount was guaranteed. Plaintiff disputes that the weekly draw was guaranteed although he does not dispute the fact that CF would not recapture amounts paid. (Docs. 78 at 7; 83 at 2.) Pederson testified that their agreement "was no more than a draw against future commissions….and that at any time, if it got so bad, then, yes, absolutely, it would stop. There's only so many handouts in life." (Pederson Dep. 25:01-05, Doc. 75, Exh. 5.) In April 2014, Plaintiff received his commission report for years 2006-2013, which shows the calculation of the commission payable. The report states that the commission percentage for 2010 and beyond was 30%. (Doc. 77, Exh. A at 3-4; Doc. 75, Exh. 17.)

CF paid Plaintiff the following wages in the years at issue: $130,875.00 in 2012, $112,025.00 in 2013, $122,600.00 in 2014 and $58,804.40 in 2015. Plaintiff traveled tens of thousands of miles for his job: in 2013, Plaintiff reported 53,000 miles for work; in 2014, Plaintiff reported 47,600 miles for work; and in 2015, Plaintiff reported 27,600 miles for work and 17,300 miles commuting. CF advanced vehicle expenses to Plaintiff and those expenses were later deducted in the formula calculating Plaintiff's commission. (Docs. 77, Exh. A at 5; 80 at 5.)

In 2013 and early 2014, Plaintiff received three checks: $35,411 from Country Ceramics, LLC; $9,414.50 from J & J Industries Inc.; and $5,000 from Joplin Floor Designs, Inc. Plaintiff

was also issued 1099s for the payments.  The payment from Country Ceramics was a specifier fee.  A specifier fee can be paid by a manufacturer after a company would specify a manufacturer's product for a project but would ultimately lose the bid on the project to a competitor.  (Doc. 78 at 10.)  CF did not have a written policy pertaining to specifier fees.  (Doc. 73 at 9.)  After Plaintiff received the specifier fee from Country Ceramics, he kicked back $7,375.00 to Joe Dineen with J&J Industries.  Plaintiff contends that the fees were gifts.  The Joplin payment originally came from a specifier fee which was shared with Plaintiff.  Plaintiff did not inform CF of these payments.  Defendants dispute that the payments from J&J and Joplin were gifts.  (Docs. 73 at 8-9; 78 at 5.)  Plaintiff testified that he could have been terminated for moonlighting due to the payments.  (Plaintiff's Dep. 271:07-14, Doc. 78, Exh. 1.)  CF learned of the payments during this litigation.

In January 2014, Plaintiff's wife filed for divorce.  As a result, Plaintiff's performance suffered.  CF began receiving complaints from customers regarding Plaintiff's performance.  CF lost customers due to Plaintiff's performance.  Pederson and Foster spoke on multiple occasions regarding Plaintiff's performance, lack of responsiveness and customer complaints.  Those conversations included the possible termination of Plaintiff's employment.  Plaintiff and Pederson also had discussions regarding the problems with his division and complaints that CF had received.  Foster also contacted the Kansas Department of Labor in the spring of 2015 regarding Plaintiff's potential termination.  In March 2015, Pederson spoke with Plaintiff about his job duties and instructed him to focus on the current projects and to stop pursuing new sales.  (Doc. 77, Exh. A at 6-7.)

In 2014, CF was awarded a contract that involved the rebuilding of Joplin High School.  Prior to being awarded the contract, Plaintiff had contacted Duane Hukill of Joplin Floor Design

because of Hukill's relationships with vendors in the area.  Plaintiff then negotiated a $100,000 flat fee for Hukill.  Plaintiff contends that he and Pederson discussed the flat fee and that Pederson had agreed to treat the fee as a job cost.  Defendants dispute that Pederson or CF agreed to treat the fee as a job cost.  Ultimately, CF credited the entire $100,000 fee against Plaintiff's commission for the contract.  Had it been treated as a job cost; Plaintiff's commission would have been significantly higher.  (Docs. 77, Exh. A. at 9-10; 80 at 8, 10-11; 82 at 2.)

Plaintiff received his final weekly draw on July 15, 2015.  Pederson testified that he stopped paying Plaintiff because his division was upside down and there was "literally no money in our agreement to continue paying him for future commissions…."  (Pederson Dep. 37:04-17, Doc. 75, Exh. 5.)  For the week of July 13 to 19, Plaintiff was paid the rate of $20.11 per hour for performing installation work on a CF job.  Plaintiff did not receive any compensation from CF after the payment for the installation work.  CF did not keep records of the hours Plaintiff worked.  Plaintiff contends that he worked, on average, 60 hours per week between January 2013 and September 25, 2015.  Defendants dispute this and state that Plaintiff did not work more than 40 hours per week as there were several complaints regarding his failure to perform work during this time period.  (Doc. 78 at 3-4.)

Between July 15 and September 25, 2015, Plaintiff stated that he worked approximately 30-35 hours per week, but also worked weeks in that time period of more than 50 hours.  (Doc. 75, Exh. 23 at 4.)  Defendants dispute that Plaintiff was working those hours between July 15 and September 25, 2015.  (Doc. 78 at 3.)  Pederson and Foster testified that Plaintiff performed minimal work after July 12, 2015. (Doc. 77, Exh. A at 8.)  Plaintiff testified that he worked "very little" in September 2015.  (Doc. 78 at 7.)

On July 23, 2015, Foster provided Plaintiff with his commission report.  On July 30, Plaintiff complained about his 30% commission rate.  (Doc. 75, Exh. 18.)  On August 25, Plaintiff's attorney sent a letter to CF.  The letter raised several complaints, including the lack of wages, failure to pay overtime, errors on commission calculations, improperly deducted payroll taxes, and an erroneous commission percentage.  (Doc. 75, Exh. 16.)  Upon receipt of the letter, Pederson testified that he was disappointed in Plaintiff and wondered why Plaintiff "would want to do this and take away the opportunity that he had."  (Pederson Dep. 154:16-21, Doc. 75, Exh. 5.)

Plaintiff's employment was terminated on September 25, 2015.  After his termination, in July 2016, CF prepared a commission spreadsheet which shows that the total commissions payable to Plaintiff was $9,857.51, although that amount has not been dispersed to Plaintiff. (Doc. 73, Exh. 7.)  Defendants dispute that the spreadsheet is a final calculation of Plaintiff's commissions.

On March 24, 2016, Plaintiff filed this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§201, et seq., the Kansas Wage Payment Act ("KWPA"), K.S.A. 44-313, and Kansas state law alleging claims of failure to pay overtime, wages due and retaliatory discharge.  (Doc. 1.)  On May 4, 2017, Defendants filed an amended answer and counterclaims against Plaintiff.  Defendants' counterclaims include unjust enrichment, embezzlement, breach of duty of loyalty, and fraudulent concealment. These claims all arise out of the payments Plaintiff received in 2013 and early 2014. (Doc. 54; *See also* Case No. 18-2009, *Commercial Floorworks, Inc. v. Endecott* (consolidated case)).

Defendants now move for summary judgment on all of Plaintiff's claims or, in the alternative, for partial summary judgment.  (Doc. 74.)  Plaintiff moves for partial summary

judgment on Plaintiff's FLSA overtime claim and KWPA claim.  (Doc. 72.)  Plaintiff also moves

for summary judgment on Defendants' counterclaims of embezzlement and unjust enrichment.

## II.    Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and an issue of fact is

"genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's

favor.  *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears

the initial burden of proof and must show the lack of evidence on an essential element of the

claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986)). The nonmovant must then bring

forth specific facts showing a genuine issue for trial.  *Garrison v. Gambro, Inc.*, 428 F.3d 933,

935 (10th Cir. 2005).  The court views all evidence and reasonable inferences in the light most

favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927

(10th Cir. 2004).

The court applies this same standard to cross motions for summary judgment. Cross

motions for summary judgment "are to be treated separately; the denial of one does not require

the grant of another."  *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  Where

the cross motions overlap, the court may address the legal arguments together. *Berges v.

Standard Ins. Co.*, 704 F. Supp.2d 1149, 1155 (D. Kan. 2010).

## III.    Analysis

### A.  FLSA Overtime Claim

Both Plaintiff and Defendants move for summary judgment on this claim. Plaintiff asserts that Defendants cannot establish that Plaintiff is exempt from overtime and Defendants argue that Plaintiff is either exempt under the outside sales or highly compensated employee exemptions.

The purpose of the FLSA is to "protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S. Ct. 1437 (1981). The FLSA generally requires an employer to "pay its employees one and one-half times their regular rate of pay for any time worked in excess of forty hours per workweek." *Archuleta v. Wal–Mart Stores, Inc.*, 543 F.3d 1226, 1228 (10th Cir. 2008). If an employer violates the FLSA, the employee may be "entitled to recoup unpaid overtime compensation and liquidated damages." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1187 (10th Cir. 2015) (citing 29 U.S.C. § 216(b)).

However, "'not all workers require[ ] the same kind of protection' under the statute." *Id.* (quoting *Ackerman v. Coca–Cola Enters., Inc.*, 179 F.3d 1260, 1263 (10th Cir. 1999)). There are certain workers who are exempt from the payment of overtime. Defendants contend that Plaintiff was exempt under either the outside salesman or the highly compensated employee exemptions. Those will be addressed in turn.

### 1.  Outside Salesman

The outside salesman exemption applies if an employee: "(1) has a primary duty of making sales or obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer and (2) is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." *Swartz v. DJ Eng'g, Inc.*, No. 12-CV-01029-DDC-KGG, 2015 WL 4139376, at *9 (D. Kan. July 9,

2015); *see also* 29 C.F.R. § 541.500.   "Significantly, the outside sales exemption does not require the employer to pay the employee on a salary basis." *See id.*

Defendants contend that both elements are met under this exemption.   Regarding the primary duty of making sales, Defendants point to their statement of facts numbered 3-7 and state that tasks other than sales were incidental to making sales.   (Doc. 77, Exh. A at 13.)   The facts cited by Defendants, however, list several job tasks, including selling.   Plaintiff also was required to essentially manage all of the jobs that he sold, which included working with the installers and negotiating material purchases with vendors.

The outside sales regulation states that the term "primary duty" is defined at § 541.700. 29 C.F.R. § 541.500.  Section 541.700 states that the term "primary duty"

> [(a)] means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.
>
> (b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700.

Although the undisputed tasks show that Plaintiff had many job duties, there is no factual basis to determine that his primary duty was making sales.  Defendants point out that Plaintiff traveled significantly to job sites; however, there are no facts to support whether those extensive

-9-

travels were to supervise the installers or make sales or for some other job duty.  The court finds

that there is a dispute of material fact as to whether Plaintiff's primary duty was making sales.

Moreover, although Plaintiff clearly travelled extensively, there is a dispute of fact as to whether

Plaintiff customarily and regularly performed his duties primarily in the Lawrence office or

outside of the office.[3]  Therefore, the motions for summary judgment regarding Plaintiff's status

as an exempt employee under the outside salesman exemption are denied.

### 2.   Highly Compensated Employee

Defendants contend that Plaintiff is exempt under the highly compensated employee

exemption for the years 2013 and 2014.  Under that exemption, an employee who received

compensation of at least $100,000 is exempt if his primary duty includes performing office or

non-manual work and if he "customarily and regularly performs any one or more of the exempt

duties or responsibilities of an executive, administrative, or professional employee." 29 C.F.R. §

541.601 (2014).[4]  Notably, in order to be exempt under this exemption, the employee must be

paid on a salary basis.  *Id.* at 541.601(b)(1); *Swartz v. DJ Eng'g, Inc.*, No. 12-CV-01029-DDC-

KGG, 2015 WL 4139376, at *9 (D. Kan. July 9, 2015).

To meet the salary-basis test, Defendants bear the burden to establish that they paid

Plaintiff: "(1) a predetermined amount, which (2) was not subject to reductions (3) based on

quality or quantity of work performed."  *Swartz*, 2015 WL 4139376, at *7.  Defendants argue

---

[3] Defendants assert that Plaintiff's affidavit regarding the extent that he worked in the office is a self-serving affidavit and should not be considered by the court.  (See Doc. 78 at 14-15.)  Defendants argue that the affidavit conflicts with Plaintiff's testimony and the evidence.  "A court should not disregard a party's evidence simply because it conflicts with his or her prior sworn statements; however, such evidence may be disregarded when a court concludes that the evidence is merely an attempt to create a sham fact issue." *Martinez v. Barnhart*, 177 F. App'x 796, 800 (10th Cir. 2006).  Defendants do not point to deposition testimony regarding the extent of work done outside of the office and at the Lawrence office for the court to determine that Plaintiff is trying to create a sham fact issue.  Although the amount of travel is extensive and would appear to negate a finding that Plaintiff spent the majority of his time in the office, the mileage evidence does not necessarily contradict the amount of time spent in the office and the court does not make credibility determinations or weigh the evidence at this stage.  Therefore, the court will not disregard Plaintiff's affidavit.
[4] The regulations were updated, effective December 2016.  *See* 29 C.F.R. § 541.601.

that Plaintiff's $2,000 weekly draw satisfies the salary basis test as it was a set amount that was not reduced based on work.  (Doc. 78 at 12-13.)  In response, Plaintiff cites to Pederson's testimony which stated that Plaintiff's draw could stop at any time.  (Pederson Dep. 25:01-05, Doc. 75, Exh. 5.)  Moreover, Plaintiff's draw did stop in July 2015 when Plaintiff's commission account was overdrawn.  To meet the salary-basis test, the predetermined wages cannot be subject to deductions.  Given the testimony and the fact that Defendants did stop paying the weekly draw in 2015, there is clearly a dispute as to whether Plaintiff's weekly draw was "subject to deductions."

Therefore, the motions for summary judgment on this ground are denied.  The court will not review the remaining requirements of this exemption as there is a genuine dispute of material fact as to whether Plaintiff was paid on a salary basis.

### 3.  Retail Services

Plaintiff moved for summary judgment on Defendants' defense that Plaintiff was exempt under the retail or service establishment exemption.  (Doc. 73 at 13.)  This defense is asserted in the pretrial order.  (Doc. 71 at 11.)  Defendants fail to respond to Plaintiff's motion on this issue.  Based on the undisputed facts that Defendants' customers are primarily contractors, the court finds that CF is not a retail or service establishment for the reasons stated in Plaintiff's memorandum.  (Doc. 73 at 13-14.)

Plaintiff's motion for summary judgment on this ground is GRANTED.

### 4.  Hours Worked

Defendants move for summary judgment on Plaintiff's FLSA claim on the basis that Plaintiff cannot establish that he worked more than 40 hours while employed by CF after July 13, 2015.  (Doc. 77, Exh. A at 19-20.)  Defendants contend that Plaintiff's general testimony that

he worked more than 40 hours is insufficient.   Defendants, however, did not keep track of Plaintiff's hours worked and do not cite to any evidence of the number of hours Plaintiff worked during the time period from July 15 to September 25, 2015.  "When the employer has failed to record compensable time and the employees have proved that they actually performed the work in question, the plaintiffs need only produce evidence sufficient to support a reasonable inference of the amount and extent of that work." *Metzler v. IBP, Inc.*, 127 F.3d 959, 965 (10th Cir. 1997). "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records…." *Id.* at 966.  Plaintiff's testimony, while not exact, is sufficient to establish an issue as to hours worked.

The court finds that there is a dispute of fact as to the number of hours worked by Plaintiff between July 15 to September 25, 2015.  Therefore, Defendants' motion for summary judgment on this basis is denied.

### 5.   Willful Violation

Defendants move to limit Plaintiff's claim for wages to two years from the date of filing on the basis that there is no evidence that Defendants acted willfully regarding their obligations under the FLSA.  (Doc. 77, Exh. A at 20-22.)  "A two-year statute of limitations applies to an action for unpaid wages under the FLSA, except where an employer acts willfully, which extends the limitations period to three years." *Garcia v. Tyson Foods, Inc.*, 766 F. Supp. 2d 1167, 1184 (D. Kan. 2011) (citing 29 U.S.C. § 255(a)).  Plaintiff bears the burden of proving Defendants acted willfully.  *Id.* (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S. Ct. 1677 (1988)).  "Willful" means "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by [the FLSA]." *Id.* at 1184–85.

Defendants contend that the uncontroverted facts do not establish that they acted willfully regarding their obligations.  Plaintiff was paid a substantial amount during all his years of employment.  Plaintiff does the same work for his current employer, who is engaged in the same business as CF, and Plaintiff is not paid overtime and is paid on a weekly draw against commissions.  (Doc. 77, Exh. A. at 5.)  Plaintiff responds that the question of willfulness is a question of fact.  Plaintiff asserts that CF has disregarded the mere possibility that it violated the FLSA.  Plaintiff contends that this is supported because Foster has not had formal training in human resources and would use the internet to look things up.  (Doc. 80 at 24.)  Plaintiff cites to *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003), *aff'd*, 546 U.S. 21, 126 S. Ct. 514 (2005), in support of his position.

*Alvarez* does not support a finding of willfulness in this matter.  In *Alvarez*, the employer was the "world's largest producer of fresh beef, pork, and related products."  339 F.3d at 898.  Notably, there had been a history of litigation and wage issues with respect to other locations.  *Id.* at 899.  There is no evidence in this case that Defendants had been on notice that any of their practices potentially violated the FLSA.

In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S. Ct. 1677 (1988), the Supreme Court held that in enacting the different statute of limitations periods, Congress "intended to draw a significant distinction between ordinary and willful violations."  *McLaughlin*, 486 U.S. at 132.  "[A] standard that merely requires that an employer knew that the FLSA 'was in the picture' … virtually obliterates any distinction between willful and nonwillful violations."  *Id.* at 132-33.  In this matter, the only evidence offered by Plaintiff, who has the burden to establish willfulness, is that Foster had not had any formal human resources training and that she utilized

the internet for research.  These facts do not establish willfulness as set forth in *McLaughlin*. Plaintiff has the burden and has failed to meet it in this matter.

Defendants' motion for summary judgment on this issue is granted.

**B.  FLSA Retaliation**

Defendants move for summary judgment on Plaintiff's FLSA retaliation claim.  Under the FLSA, an employer is prohibited from discharging an employee for exercising his rights under the statute.  This claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Pacheco v. Whiting Farms, Inc.,* 365 F.3d 1199, 1206 (10th Cir. 2004).  To establish a prima facie case, Plaintiff mush show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection based on the temporal proximity.  *Hamby v. Assoc. Centers for Therapy*, 230 F. A'ppx. 772, 785, (10th Cir. 2007).

Defendants do not dispute, at this stage, that Plaintiff has established a prima facie case. The court agrees.  Plaintiff's complaints to Defendants regarding his wages were protected activity, Plaintiff was terminated, and there was a causal connection as his termination occurred only one month after the protected activity.  *See id*.  The burden then shifts to Defendants to "offer a legitimate non-retaliatory reason for the adverse employment action."  *Id.*  Defendants have stated that the termination was due to Plaintiff's work performance, which had declined over a period of time.  This is a sufficient legitimate non-retaliatory reason.

The burden now shifts to Plaintiff to show that Defendants' stated reason is a pretext for retaliation. *Id.*  "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.  In establishing pretext, an employee can show the employer's proffered reason was so

inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Poulsen v. Humana Ins. Co.*, 675 F. App'x 811, 816 (10th Cir. 2017) (internal citations omitted).

Plaintiff contends that Pederson's change in attitude is evidence of pretext. Specifically, Plaintiff states that Pederson stated that he would do what was fair with respect to Plaintiff's compensation but then later testified that he was disappointed after receiving the letter from the attorney. (Doc. 80 at 24-25.) Pederson testified that he felt like "here we go. Some more wasted time on Earth." (*Id.* at 25) Plaintiff cites to *Maughan v. Alaska Airlines, Inc.*, 281 F. App'x 803, 807 (10th Cir. 2008), in support of his position that this change in attitude establishes pretext. In *Maughan*, after a supervisor learned that the plaintiff intended to retire in a certain amount of time, the plaintiff's relationship with the supervisor "changed drastically" and, suddenly, there were issues with the plaintiff's performance. *Id.* at 804-05. The plaintiff's employment was then terminated for deficient performance, one month after the plaintiff confirmed his retirement plans. *Id.* at 805. The Tenth Circuit found pretext on the basis of the supervisor's "change in attitude," and other sufficient evidence, including the forging of plaintiff's signature and the addition of a new page on the performance review. *Id.* at 807-08. The facts in *Maughan* are not similar to the facts in this matter.

The alleged "change in attitude" in this case is the testimony of Pederson that he would be fair and his later disappointment in Plaintiff's position on his wages. Although Pederson testified that he wanted to be fair with respect to the commission disputes, there is no indication that Pederson then changed his mind and decided that he would not pay Plaintiff any commission earned under their agreement. In any event, the facts do not support a finding that Defendants' legitimate reason for termination is pretext for retaliation nor do the facts create a dispute as to pretext. Plaintiff has not shown that Defendants' proffered reason "was so inconsistent,

implausible, incoherent, or contradictory that it is unworthy of belief." *Poulsen*, 675 F. App'x at 816.  Significantly, Plaintiff does not dispute the facts concerning his deficient performance that began in early 2014 and got worse with time.   Moreover, Plaintiff does not dispute that Defendants lost customers due to Plaintiff's performance.  Additionally, Pederson and Foster had several discussions regarding Plaintiff's performance and his potential termination prior to August 2015.  Foster also contacted the KDOL regarding Plaintiff's potential termination in the spring of 2015.  All of these facts show that Defendants contemplated Plaintiff's termination over a long period of time.  There is no evidence that Defendants started raising performance problems after the August 2015 letter like in *Maughan*. Rather, Defendants had identified the issues with Plaintiff's performance for several months prior to August 2015.

The court finds that Plaintiff has not met his burden to establish pretext.  Therefore, Defendants' motion for summary judgment on Plaintiff's FLSA retaliation claim is granted.

### C.  KWPA Unpaid Wages Claim

The KWPA sets forth requirements concerning employees' wages.  *See* K.S.A. § 44–314.  If an employer willfully fails to pay an employee his wages as required under section 44-314, the employer is liable for both the wages due and a penalty in an amount up to 100% of the unpaid wages. *See* § 44–315(b).   In order to recover unpaid wages under the KWPA, Plaintiff must establish that he is entitled to the wages.  *Garcia v. Tyson Foods, Inc*., 766 F. Supp. 2d 1167, 1187 (D. Kan. 2011).  The pretrial order states that Plaintiff seeks $185,329.22 in unpaid wages and commissions and the same amount for a statutory penalty.  (Doc. 71 at 18.)

Defendants move for summary judgment and Plaintiff moves for partial summary judgment on this claim.  First, Defendants seek summary judgment on any claim for unpaid wages prior to March 24, 2013.  (Doc. 77, Exh. A at 25.)  The statute of limitations on claims

under the KWPA is three years.  *Ingham v. Digital Sols., Inc.*, No. 98-2486-JWL, 2000 WL 126920, at *1, n. 2 (D. Kan. Jan. 19, 2000) (citing K.S.A. § 60-512(1)).  Plaintiff responds that there are questions of fact regarding whether credits or offsets are outside the statute of limitations.   (Doc. 80 at 25.)   The parties both presented spreadsheets regarding their calculations.   Regardless of when the parties calculated the credits and offsets for the commissions, the statute of limitations on Plaintiff's claim for unpaid wages is three years. Therefore, Plaintiff cannot recover any unpaid wages that accrued prior to March 24, 2013. Accordingly, Plaintiff will not be able to present any evidence of unpaid wages that accrued prior to that date.

The remaining issues concern the amount of Plaintiff's commission percentage, the commission spreadsheets, the deduction of the employer payroll taxes in the commission formula[5] and the Joplin commission.  The court finds that there are genuine disputes of material fact as to Plaintiff's claims for unpaid wages as to these issues.

Therefore, Defendants' motion for summary judgment on Plaintiff's KWPA claim is denied in part and granted in part.  Plaintiff's motion for summary judgment on this claim is denied.

### D.  Common Law Retaliatory Discharge

Under Kansas law, "wrongful discharge claims under Kansas law are analyzed using the three-part framework established in *McDonnell Douglas*."  *Roth v. Francesca's Collection, Inc.*,

---

[5] Plaintiff argues that this deduction is improper pursuant to K.S.A. § 44-319(a).  That statute sets forth permissible deductions from wages.  Plaintiff, however, does not address whether the deduction was from his "wages." *See Salon Enterprises, Inc. v. Langford*, 29 Kan. App. 2d 268, 270–71, 31 P.3d 290, 292–93 (2000) (discussing wages and deductions for an employee who is paid by commissions).  Wages "means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions." K.S.A. § 44-313.  The "deduction" of the payroll tax occurred in the calculation of Plaintiff's commission, not from his $2,000 weekly draw.  Defendants argue in response to Plaintiff's motion that the labor burden deduction was agreed to by Plaintiff and that the parties have wide discretion in fixing employment contracts.  (Doc. 78 at 23.)  Plaintiff disputes that he agreed to this deduction.

295 F. Supp. 3d 1177, 1183 (D. Kan. 2018).   Because the standard utilized is the same as addressed under Plaintiff's FLSA retaliation claim, Plaintiff's common law retaliatory discharge fails for the reasons discussed *supra*.   Plaintiff has not established that Defendants' non-retaliatory reason for discharge is pretext for retaliation.

Therefore, Defendants' motion for summary judgment on this claim is granted.

### E.  Embezzlement

Plaintiff moves for summary judgment on CF's claim of embezzlement on the basis that there is no dispute of material fact regarding the ownership of the funds paid to Plaintiff by County Ceramics, J&J Industries and Joplin Floor Designs.   (Doc. 73 at 19-21.)   Under Kansas law, embezzlement is "[t]he fraudulent appropriation of property by one lawfully entrusted with its possession."   *Bolton v. Souter*, 19 Kan. App. 2d 384, 386, 872 P.2d 758, 760 (1993).   "The elements are: (1) a relationship must exist between the owner of the money and the embezzler, (2) the money alleged to have been embezzled must have come into the possession of the embezzler by virtue of that relationship, and (3) there must be an intentional and fraudulent appropriation or conversion of the money."   *Id.* at 386-87.

Plaintiff contends that the payments were his and that this fact is undisputed because they were paid to him and he was issued 1099s for the payments.   In response, Defendants cite to several alleged factual disputes regarding the "circumstances" surrounding the payments.   (Doc. 78 at 25-26.)   Plaintiff points out, however, that the facts regarding the payments are generally not in dispute and that none of the facts cited by Defendants support a finding that the payments were the property of CF.   (Doc. 83 at 10.)   Clearly, in order to fraudulently appropriate CF's funds, CF must show that they were the owner of the money or that there is a genuine dispute for the trier of fact as to this issue.   They have not done so.   Defendants have just generally stated

that CF "can also show its property came to Endecott initially lawfully (as Endecott argues), but that the monies belong to" CF.  (Doc. 78 at 25.)  Defendants, however, have not pointed to a fact, either disputed or undisputed, that those funds paid to Plaintiff were the property of CF. Defendants simply discuss the suspicious circumstances of the payments and fail to cite to any evidence in support of the position that it was CF's property.  This is not sufficient to create a dispute of material fact as to the ownership of the funds.  The undisputed evidence is that funds were paid directly to Plaintiff and Plaintiff was issued 1099s for the same.  Moreover, as the facts clearly show that Plaintiff believed that the funds were his, even if he was "moonlighting," there is no evidence of intentional and fraudulent appropriation.

Therefore, Plaintiff's motion for summary judgment on CF's claim of embezzlement is granted.

### F.  Unjust Enrichment

Plaintiff moves for summary judgment on the basis that CF cannot maintain a claim for an equitable remedy when there is an adequate remedy at law.  CF asserted a claim for unjust enrichment on the basis that Plaintiff has allegedly been unjustly enriched by diverting payments that Plaintiff accepted from County Ceramics, J&J Industries and Joplin Floor Designs.  (Doc. 54 at 25.)  CF alleges that it would be unjust for Plaintiff to retain the payments as they were obtained due to conversion, breach of fiduciary duty, fraudulent concealment and fraud.  (*Id.*)

In support of his motion for summary judgment on this claim, Plaintiff cites to *Garcia v. Tyson Foods, Inc*., 766 F. Supp.2d 1167, 1188 (D. Kan. 2011), *Deeds v. Waddell & Reed Inv. Mgmt. Co*., 280 P.3d 786, 795 (Kan. App. 2012), and *Nieberding v. Barrette Outdoor Living, Inc*., No. 12-2353-KHV, 2012 WL 6024972, at *4 (D. Kan. Dec. 4, 2012).  Defendant argues that those cases are inapplicable as the plaintiffs had a statutory remedy or claim on a contract.

In *Garcia*, the court dismissed the plaintiff's quantum meruit claim as there was a statutory remedy under the KWPA.  766 F. Supp.2d at 1188.  In *Deeds*, the court also dismissed the unjust enrichment claim because the plaintiff had a remedy under the KWPA.  280 P.3d at 795.  In *Nieberding*, the court declined to dismiss the unjust enrichment claim on the defendant's motion to dismiss even though the plaintiff had also alleged claims under the KCPA and breach of warranty.  2012 WL 6024972, at *4.  The court held that the plaintiff could not take both claims to judgment, but that the court would not dismiss the equitable claim at that time.  *Id.*

Plaintiff's authority does not require this court to dismiss the unjust enrichment claim.  CF does not have a statutory or contractual remedy available on its claim.  Therefore, Plaintiff's motion for summary judgment on CF's unjust enrichment claim is denied.

### IV.    Conclusion

Plaintiff's motion for summary judgment (Doc. 72) is GRANTED IN PART AND DENIED IN PART and Defendants' motion for summary judgment (Doc. 74) is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED this 12th day of October, 2018.


__s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE